**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

|  |  |
|---|---|
| Barbie Green, Karen Malmkar, Maria Garza, Glenda Brown, Michelle Crosier, *on behalf of themselves and all others similarly situated*, | : : : : : Case No.: |
| Plaintiffs, | : : |
| vs. | : : |
| General Motors LLC, | : **JURY DEMAND** : |
| Defendant. | : : |

**CLASS ACTION COMPLAINT**

Plaintiffs, Barbie Green, Karen Malmkar, Maria Garza, Glenda Brown, and Michelle Crosier, by undersigned counsel, bring the following Class Action Complaint against General Motors LLC, and allege, on their own behalf and on behalf of all others similarly situated, as follows:

**INTRODUCTION**

1.      Defendant General Motors LLC ("GM" or "Defendant") sold Plaintiffs and the putative class members defective 2021-2023 Chevrolet Trailblazer, 2020-2022 Chevrolet Traverse, 2020-2023 Chevrolet Malibu and 2020-2023 Buick Encore vehicles (the "Class Vehicles") that contain defective transmission control (shifter) assemblies. The defective shifter assemblies prevent the vehicles from detecting when the driver places the car in "Park."  As a result, the vehicle goes into accessory mode and the driver cannot shut off or lock the vehicle, the instrument cluster displays a "Shift to Park" message even though the gear shifter is already in "Park," and the battery drains (the "Shift to Park Defect" or the "Defect").

2.      When the Defect manifests, owners must resort to all manner of gimmicks to get the vehicle to recognize the transmission has been placed in Park and allow the driver to turn

off the vehicle.  For instance, owners must manipulate the shifter back and forth or repeatedly drive forwards and backwards before placing the vehicle in Park again. Class Vehicle owners have reported that it can take as long as 20 minutes to get their vehicles to shut off.

3.     Because drivers cannot reliably turn off their vehicles when reaching their destination, the Defect substantially impairs the Class Vehicles' ability to provide safe and reliable transportation and renders the vehicles unmerchantable and worth less money at the time of sale or lease.

4.     Shifter assemblies are not expected replacement or maintenance parts and absent a defect should not require replacement. Nonetheless, GM fails to repair the Defect under its New Vehicle Limited Warranty.  Indeed, it did not issue a bulletin to its dealers regarding the Defect until November 2023, at which point many Class Vehicles' 36,000 mile/36 month warranty periods had already expired.  Nor has GM issued a voluntary recall regarding the Defect or otherwise permitted its dealerships to perform repairs regarding the Defect as 'goodwill' gestures outside the warranty period.  As a result, GM dealers regularly charge Class Vehicle owners hundreds or thousands of dollars to attempt a repair.  Moreover, the proposed repair – replacing the shifter control assembly – does not actually correct the Defect.

5.     Additionally, GM had knowledge of the common defect before selling the Class Vehicles to Plaintiffs and class members.  For instance, prior model year GM vehicles (2016-2019) also had defective transmission control (shifter) assemblies that suffered from the Shift to Park Defect and GM issued several technical service bulletins acknowledging the defect that pre-date the sale of the Class Vehicles at issue in this case.  It was also sued several times because of the defect. *See, e.g., Jefferson v. Gen. Motors, LLC*, 344 F.R.D. 175, 182 (W.D. Tenn. 2023), *modified on reconsideration,* 2023 WL 5662596 (W.D. Tenn. Aug. 31, 2023) (certifying Tennessee class of 2017-2018 model year vehicles with the shift to park defect);

2

*Riley v. Gen. Motors, LLC*, 2024 WL 1256056 (S.D. Ohio Mar. 25, 2024) (certifying Ohio class of 2016-2019 model year vehicles with the shift to park defect).

6.     GM also learned about the Defect via pre-sale testing on the Class Vehicles, early consumer complaints directly to GM and its dealerships, and from reports from dealerships.  Nonetheless, GM failed to disclose the defect to Plaintiffs or other putative class members at the time of sale or lease.

7.     GM's sale of the defective Class Vehicles with the undisclosed defect and failure to repair constitute fraudulent concealment, breaches of the express and implies warranties, violations of state consumer protection and unfair and deceptive trade practices acts, and give rise to unjust enrichment claims.  To remedy GM's unlawful conduct, Plaintiffs, on behalf of the proposed class members, seek damages and restitution from GM.

## PARTIES

8.     Plaintiff Barbie Green is, and at all times mentioned herein was, an adult individual residing in Burlison, Texas.

9.     Plaintiff Karen Malmkar is, and at all times mentioned herein was, an adult individual residing in Waco, Texas.

10.     Plaintiff Maria Garza is, and at all times mentioned herein was, an adult individual residing in Comanche, Texas.

11.     Plaintiff Glenda Brown is, and at all times mentioned herein was, an adult individual residing in Milan, Tennessee.

12.     Plaintiff Michelle Crosier is, and at all times mentioned herein was, an adult individual residing in Worcester, Massachusetts.

13.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48243.  GM's

sole member is General Motors Holdings LLC, a Delaware limited liability company with its principal place of business in Michigan.  General Motors Holdings LLC's sole member is General Motors Company, a Delaware corporation with its principal place of business in Michigan.  Thus, Defendant General Motors LLC is a citizen of Michigan with a principal place of business in Michigan.

14.     Defendant General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles.  Defendant General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and GM are each citizens of different states.

16.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff presents a claim under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.  As to the state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

17.     Personal jurisdiction exists over GM in this District and venue is proper because GM's headquarters and principal place of business is located in this District.

## THE SHIFT TO PARK DEFECT

*The Defect*

18.     Shifter assemblies are not expected maintenance or replacement parts and absent a defect should last the life of the vehicle.

19.     However, the Class Vehicles were sold with common defective transmission control (shifter) assemblies. Specifically, the park switch within the shifter assemblies fails to recognize when the transmissions have been placed in park, which prevents the vehicles from shutting off.

20.     The defect exists at the time of sale or least even though it often does not begin manifesting until several months thereafter.

21.     As a result of the defect, when Class Vehicle owners park their car, put the transmission in the Park position and then try to turn off the ignition, the vehicle enters accessory mode, the vehicle's instrument clusters display a message stating "Shift to Park" even though the vehicle is already in Park, and the vehicles will not turn off. When in accessory mode, the batteries will eventually drain.

22.     To eventually get their vehicles to recognize the transmission has been placed in Park so that they can shut off the vehicles and prevent their batteries from draining, owners are forced to resort to all sorts of gimmicks such as manipulating the shifter and driving the vehicle back and forth. Owners have reported that it can take as long as *20 minutes*. *See, e.g.*:

- NHTSA Complaint, October 22, 2023 (NHTSA ID NUMBER 11551252) (2022 Malibu): "When trying to stop park and turn off my car it will display an error message saying shift to park. This first started about a week ago ***and I constantly have to turn the car on and off while I am trying to wiggle the shifter in an effort to get it to acknowledge that the car is parked so I can get out. This has also caused me to be stuck in the car for about 5 minutes on a good day to 20 minutes on a bad as I am unable to turn the car off***. I am worried that when I leave the car it will roll away into traffic or stop at working in a busy intersection."

5

23.     Other owners have resorted to disconnecting their car batteries whenever the shift to park message appears:

- October 26, 2023 (NHTSA ID NUMBER: 11551977) (2022 Trailblazer): "'shift to park' on my dash screen preventing me from locking my car and the accessories all remain on. I have to disconnect my battery otherwise my car dies if it remains on. I reconnect the battery regardless of how long it has been disconnected and the same shift to park issue reappears this first happened 10/24/23 and again today 10/26/23"

24. The Defect poses a safety risk to Class Vehicle drivers and their passengers, who cannot rely on their vehicles for reliable transportation.

***GM's History of Selling Earlier Model Year Vehicles with the Same Shift to Park Defect***

25.     Beginning in at least 2016, GM began manufacturing, testing, and selling vehicles with defective shifter assemblies resulting in the same Shift to Park defect at issue here, specifically 2017-2019 GMC Acadia, 2019 Chevrolet Blazer, 2016-2019 Chevrolet Malibu, 2018-2019 Chevrolet Traverse, and 2016-2019 Chevrolet Volt vehicles.

26.     In 2017 GM undertook a years-long investigation regarding the Shift to Park Defect which resulted in GM issuing a series of technical service bulletins acknowledging the defect and proposing various repair attempts.

27.     For instance, on December 5, 2017, GM issued an "Engineering Information – Shift to Park Message Displayed" bulletin to its dealers applicable to 2016-2018 Chevrolet Malibu vehicles acknowledging "Some customers may comment on after placing the transmission control (shifter) into Park, when attempting to turn the vehicle off, the vehicle will go into accessory mode but will not fully turn off. The transmission will mechanically be in Park, but the electrical circuit intended to indicate the shift lever position may not be functioning correctly."

28.     In 2018, GM issued TSB No. 18-NA-297, applicable to 2016-2018 Chevrolet Malibu and Chevrolet Traverse vehicles, and 2017-2018 GMC Acadia vehicles, which acknowledged that "Some customers may comment on an intermittent Shift to Park message when in Park and turning off the vehicle" and that "The cause of the condition may be the park switch in the transmission control (shifter) assembly not pulling BCM signal low to electronically show Park condition." The bulletin proposed attempting a repair by replacing the transmission control (shifter) assembly.

29.     Between 2019-2020, GM issued a series of TSB No. 19-NA-206 bulletins which applied to 2017-2019 GMC Acadia, 2019 Chevrolet Blazer, 2016-2019 Chevrolet Malibu, 2018-2019 Chevrolet Traverse, and 2016-2019 Chevrolet Volt vehicles.   The bulletins reiterated that "Some customers may comment on seeing an intermittent Shift to Park message when the vehicle has been shifted into Park, and the ignition has been turned to the Off position" and "[t]he cause of the condition may be that the park switch in the transmission control (shifter) assembly is not pulling the BCM signal low to electronically show that the vehicle is in the Park position." The various iterations of the bulletins proposed either installing a 'jumper harness' or replacing the entire shifter harness.

30.     As a result of GM's failure to timely repair the above-referenced earlier model year vehicles, GM faced an onslaught of class action litigation involving the Shift to Park Defect. *See, e.g., Jefferson v. Gen. Motors, LLC*, 344 F.R.D. 175, 182 (W.D. Tenn. 2023), *modified on reconsideration,* 2023 WL 5662596 (W.D. Tenn. Aug. 31, 2023) (certifying Tennessee class of 2017-2018 model year vehicles with the shift to park defect); *Riley v. Gen. Motors, LLC*, 2024 WL 1256056 (S.D. Ohio Mar. 25, 2024) (certifying Ohio class of 2016-2019 model year vehicles with the shift to park defect).

***GM Belatedly Acknowledges the Class Vehicles Suffer from the Defect But Fails to Repair the Class Vehicles***

31.     Despite its extensive knowledge of the Defect dating back to at least 2016-2017, GM did not issue a bulletin to its dealers applicable to the Class Vehicles at issue in this case until November 22, 2023, when it issued TSB No. 23-NA-119.  By November 2023, GM's 36,000 mile / 36 month limited warranty period had already expired for many Class Vehicle owners and lessees.

32.     TSB No. 23-NA-119 applies to 2020-2023 Buick Encore GX, 2021-2023 Chevrolet Trailblazer, and 2020-2023 Chevrolet Malibu Class Vehicles; however, it does not apply to 2020-2022 Chevrolet Traverse Class Vehicles even though those vehicles also suffer from the same defect.

33.     As with the above-bulletins applicable to earlier model year GM vehicles, TSB No. 23-NA-119 notes that owners may complain that the "'Shift to Park' message is displayed on the DIC'" and about a "No Start" condition; explained the "condition may be caused by a malfunction of the park switch inside of the shifter assembly"; and recommended that dealers attempt a repair by "replac[ing] the shifter control."

34.     GM issued updated versions of bulletin 23-NA-119 on December 19, 2023 and February 27, 2024 which provide the same proposed repair – replacing the shifter control.

35.     However, GM's proposed repair – replacing the shifter control – does not correct the defect.  Indeed, Plaintiffs Green had the transmission/shifter control replaced but the defect continued to manifest thereafter.  Other owners have made similar complaints to NHTSA. *See., e.g.*:

- NHTSA Complaint, July 22, 2023 (NHTSA ID NUMBER: 11533872) (2020 Malibu): "Since last year I am having this problem in this car, even after parking the car, it is giving an error of 'shift to park', ***I have already taken it to the car dealership twice to***

*fix this problem and still the problem is not getting fixed in the car*. Not even that I live in California and while coming back from Vegas last year, this car suddenly stopped working while on the freeway, luckily I was near truck station so I stopped the car. This is a new car and I didn't even drive 36000 miles on it and it is giving me problems. This car is a serious problem and I would request nhtsa to please step in and take action regarding the manufacturers."

- NHTSA Complaint, July 25, 2023 (NHTSA ID NUMBER: 11534337 (2021 Malibu): "Malibu will be in park, engine off, but when exiting the vehicle a message will appear "SHIFT TO PARK", although the vehicle is in park. The electrical will not shut off, which is a hazard, as the vehicle's battery remains on. I am forced to turn the car on, shift to a different position (not "park", and then forcefully shift back to park). *I contacted the dealer that has done all of my work, they were aware of the problem and offered to fix under warranty. They claim to have replaced my transmission harness. The problem was fixed for about one "week" but now the problem has resumed sporadically*. I have contacted the dealer again as of this morning to seek resolution. The consumer stated that the manufacturer has not resolved the issue yet."

36.     Moreover, GM has not issued a recall regarding the Shift to Park Defect or otherwise authorized its dealerships to attempt to repair the defect outside of its New Vehicle Limited Warranty period.  Thus, because many owners' warranties had already expired by the time GM issued a bulletin to its dealers, dealers charge Class Vehicle owners hundreds or thousands of dollars out-of-pocket to attempt the repair. For instance, Plaintiff Crosier had to pay over $700 for a replacement part, and GM dealerships told Plaintiff Malmkar she would have to pay approximately $2,000 for a repair and told Plaintiff Garza she would have to pay between $800-1,000 for a repair.  Other owners have made similar complaints. *See, e.g.*:

- NHTSA Complaint, July 14, 2022 (NHTSA ID NUMBER: 11473941 (2020 Malibu): "A few days ago, when I put the car in park and turned it off, there was a message on the screen saying 'Shift to Park.' It was in park. I could not get out of the car because it was still getting power. If I tried to lock the doors, it sounded the alarm. I had to turn the car on and off multiple times to get it to go away. It would've drained the battery if I'd left it. Who knows if it was really in park either. It's been doing it ever since. *I called the dealer and they want $350 to fix it. The guy told me they've been seeing this on Malibu's and 'now it's happening on the Traverse models, too.'* I've been reading online how this has been happening since at least 2016, but there is no recall. Why NOT?? This is dangerous and they're aware of the problem. They've issued service bulletins on how to fix it!"

9

- December 19, 2022 (NHTSA ID NUMBER: 11497994) (2020 Malibu): "Shift to Park Alarm will not stop beeping. Looked into it on the internet found it to be a known issue with GM. Can prevent the doors from unlocking and would drain battery and annoyance. ***Replaced shifter assembly at a cost of $567.28*** I believe GM knows of the issue and should recall the defective parts. I am making this complaint on behalf of my 85 year old Mother that purchased the 2020 Malibu with the remaining 3 year/36000 miles warranty. In November of 2022 she had the Alarm Shift to Park come up and would not stop. I return the car to the shop where she purchased it, expecting the issue to be covered by warranty. I found out the car was put in service in August of 2019 making the warranty expired. The mechanic that replaced the shifting assembly explained the problem to me and gave me the defective part. When researching the problem I found that GM it aware of the issue and should recall and fix the problem. I have contacted GM but they refuse to reemburse me. I filed a complaint with the BBB and I see that there is a class action lawsuit over this issue. I have my complaint on file in hope that GM will voluntarily recall or be forced to if enough people complain."

- November 3, 2023 (NHTSA ID NUMBER: 11553473 (2021 Malibu): "When trying to turn the car off, it will not allow me, warning light comes on saying shift to park. This has happened several times over the past week. I have to continuously turn the car on and off, put in drive then back to park before the message goes away, allowing me to turn off the car. ***I am 3k miles out of my bumper to bumper warranty, so the dealership is charging me $500.15 for a new shifter assembly for what they said was a common failure in GM cars. If its common then it should be a recall for several make and model years***. My coworker has 2021 Blazer and the same thing happened to her but she was still under warranty so her repair cost $0."

- March 1, 2024 (NHTSA ID Number: 11574930) (2021 Malibu): ""Shift to Park" message appears in the car's Driver Information Center, even when it is already in Park. It doesn't recognize that the vehicle is in park. I have to wiggle the gear several times before the message clears. It doesn't allow me to lock my vehicle when this happens, I believe the vehicle stays on while this message is on the DIC, making it very unsafe. I see that there are several complaints about this issue but no recall has been made***. The dealer refuses to do a free diagnostic test knowing that these vehicles have had issues. My vehicle is no longer under warranty at 54,000 miles, I will be out of pocket the expense but it's definitely unfair that this has not been an issue recalled by GM.***"

## GM'S WARRANTY

37.     Each Class Vehicle sale or lease is accompanied with GM's 3-year / 36,000-mile New Vehicle Limited Warranty.

38.     GM provides the warranty booklets to Plaintiffs and class members via its dealerships. Warranty booklets are also available on GM's website. *See* https://www.chevrolet.com/owners/warranty (last visited April 2, 2024).

39.     The terms of GM's NVLW are contained in the warranty booklet that Plaintiffs and all class members received at the time they purchased or leased the Class Vehicles.

40.     GM's warranty booklet applicable to the Class Vehicle each state that "The warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period, excluding slight noise, vibrations, or other normal characteristics of the vehicle. Needed repairs will be performed using new, remanufactured, or refurbished parts" and that to obtain repairs owners must take their vehicles to a GM dealer "within the warranty period and request the needed repairs." "Reasonable time must be allowed for the dealer to perform necessary repairs."

41.     Thus, GM's warranties contain contractual promises that GM made directly to Class Vehicle owners and lessees to provide for repairs that correct vehicle defects.

42.     GM controls execution of all warranty repairs by its dealers, as it provides training, materials, special tools, diagnostic software, and replacement parts to its dealers, and demands that the warranty repairs be performed in strict accordance with its repair guidelines, Technical Service Bulletins, and other instructions.

43.     In return, GM pays its authorized dealerships a monetary compensation for such warranty repairs.

44.     Therefore, GM's authorized dealers are its agents for purpose of vehicle repairs, and knowledge of a defect reported to any such dealer can be imputed to GM.

## GM'S PRE-SALE KNOWLEDGE OF THE DEFECT

45.     GM knew but failed to disclose the Shift to Park Defect to Plaintiffs and Class Vehicle owners.

46.     As set forth above, GM learned about the Shift to Park Defect via its investigation into earlier 2016-2019 model year GM vehicles with defective shifter assemblies that suffer from the same Shift to Park Defect that affects the Class Vehicles in this case.

47.     GM additionally became aware of the Defect through other sources not available to Plaintiffs and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to GM's network of dealers and directly to GM, aggregate warranty data compiled from GM's network of dealers, testing conducted by GM in response to consumer complaints, and repair order and parts data received by GM from GM's network of dealers.

48.     During the pre-release process of manufacturing, engineering, and performing durability testing on the Class Vehicles, which occurred before GM began selling the Class Vehicles in 2019, GM learned that the Class Vehicles' common shifter assemblies suffer from the Shift to Park Defect.

49.     GM learned about the Shift to Park Defect via early reports about the Class Vehicles experiencing the Shift to Park Defect from GM dealerships shortly after it began shipping the Class Vehicles.  These reports occurred when dealerships contacted GM with inquiries concerning warranty coverage and with technical questions regarding the Class Vehicles' shifter assemblies.

50.     GM also learned about the Shift to Park Defect because of the higher-than-expected number of replacement shifter assemblies ordered by GM dealerships, which alerted GM that the Class Vehicle shifter assemblies – which are not typical maintenance or replacement parts – were defective and needed replacement at significantly higher rates than non-defective shifter assemblies.

51.     GM dealerships use GM OEM replacement shifter assemblies that they order directly from GM and GM maintains part sales data including records of the number of Class Vehicle shifter assemblies sold, and GM analyzes this data to identify emerging safety and quality issues.  GM learned about the Defect in part by analyzing part sales data and discovering the unusually high rate of replacement shifter assemblies installed in Class Vehicles.

52.     GM also knew about the Shift to Park Defect because numerous consumer complaints about the Defect were made directly to GM and its dealerships. The large number of complaints, and the consistency of their descriptions alert GM to this serious Defect affecting the Class Vehicles.  The full universe of complaints made directly to GM about the Shift to Park Defect is information presently in the exclusive custody and control of GM and is not yet available to Plaintiffs prior to discovery.  However, many Class Vehicle owners complained directly to GM and GM dealerships and service centers about the repeated panoramic glass roofs failures their vehicles experienced.

**The NHTSA Complaints and Online Discussions of the Defect**

53.     Since GM began selling the Class Vehicles, owners have been complaining about the Shift to Park Defect directly to GM and have been posting such complaints online.

54.     For instance, Class Vehicle owners repeatedly complained to the National Highway Traffic Safety Administration ("NHTSA").  GM monitored the NHTSA complaints

internally and learned about the Defect from the NHTSA complaint amongst other sources.

Below are representative NHTSA complaints:

- September 2, 2021 (NHTSA ID NUMBER: 11431536) (2020 Malibu): "Shift to park displays when I put my car in park and the vehicle will not turn off. I have read that there have been recalls on this issue up to 2019 but nothing for 2020. My car is not even 2 years old...I shouldn't have a problem turning my vehicle off especially since it's been an issue in the past"

- October 14, 2021 (NHTSA ID NUMBER: 11436835) (2020 Malibu): "The car will also say 'Shift to Park' when trying to turn it on, even though it is already in shift."

- March 5, 2022 (NHTSA ID NUMBER: 11455310) (2020 Malibu): "Shift to park error"

- June 20, 2022 (NHTSA ID NUMBER: 11470017) (2020 Malibu): "The shifter gear control/ shifter assembly keeps failing on and off. It'll give me a warning shift to park. It did this while drive on a major highway then my car loss all power as I was in the second lane causing so much safety concerns. It is also alerting me when I'm in park now that I need to shift to park more frequently. Extreme issue."

- July 14, 2022 (NHTSA ID NUMBER: 11473941) (2020 Malibu): "A few days ago, when I put the car in park and turned it off, there was a message on the screen saying 'Shift to Park.' It was in park. I could not get out of the car because it was still getting power. If I tried to lock the doors, it sounded the alarm. I had to turn the car on and off multiple times to get it to go away. It would've drained the battery if I'd left it. Who knows if it was really in park either. It's been doing it ever since. I called the dealer and they want $350 to fix it. The guy told me they've been seeing this on Malibu's and 'now it's happening on the Traverse models, too.' I've been reading online how this has been happening since at least 2016, but there is no recall. Why NOT?? This is dangerous and they're aware of the problem. They've issued service bulletins on how to fix it!"

- September 20, 2022 (NHTSA ID NUMBER: 11485411) (2020 Malibu): "This car is a rental. After driving the car, I parked it at my final destination, shifted it into park, and attempted to turn the vehicle off. The vehicle would not turn off and flashed a warning on the instrument panel instructing me to shift into park even though the car was already in park. The car would only finally turn off after several attempts at shifting in and out of park.

- December 17, 2022 (NHTSA ID NUMBER: 11497874) (2020 Malibu): "Shift to park error, No power to car, reduced engine power, camshaft positioning error, brakes failed (completely went hard unable to press) almost causing crash."

- December 19, 2022 (NHTSA ID NUMBER: 11497994) (2020 Malibu): "Shift to Park Alarm will not stop beeping. Looked into it on the internet found it to be a known issue with GM. Can prevent the doors from unlocking and would drain battery and annoyance. Replaced shifter assembly at a cost of $567.28 I believe GM knows of the issue and should recall the defective parts. I am making this complaint on behalf of my 85 year old Mother that purchased the 2020 Malibu with the remaining 3 year/36000 miles warranty. In November of 2022 she had the Alarm Shift to Park come up and would not stop. I return the car to the shop where she purchased it, expecting the issue to be covered by warranty. I found out the car was put in service in August of 2019 making the warranty expired. The mechanic that replaced the shifting assembly explained the problem to me and gave me the defective part. When researching the problem I found that GM it aware of the issue and should recall and fix the problem. I have contacted GM but they refuse to reemburse me. I filed a complaint with the BBB and I see that there is a class action lawsuit over this issue. I have my complaint on file in hope that GM will voluntarily recall or be forced to if enough people complain."

- February 27, 2023 (NHTSA ID NUMBER: 11509366) (2020 Malibu): "I put the car in park and it says a message that says shift to park but I am in park already and now my battery keeps draining and the lights on shifter blink continuously when I'm in park if I click shift button the message goes away but I don't think it should be doing this and I'm not the only person from what I have read."

- May 24, 2023 (NHTSA ID NUMBER: 11523717) (2020 Malibu): "My vehicle malibu2020. When I park sometimes It says shift to park sign. On dash board. The makes it difficult for car. To shut. off i have to keep pressing the plus and minus sign on the gear shift to cut off."

- May 26, 2023 (NHTSA ID NUMBER: 11524090) (2020 Malibu): "When shifting into park the display will show the car is in park but there will be an alarm informing me to put the car in park."

- June 8, 2023 (NHTSA ID NUMBER: 11526119) (2020 Malibu): "About 3 months ago, I started experiencing the shift to park problem where my car would turn off completely and would be still and solid but the car wouldn't register being in park."

- June 30, 2023 (NHTSA ID NUMBER: 11529828) (2021 Malibu): "The car is constantly displaying the shift to park display on the dash after the car is placed in park. Can turn the car off with the display but the prompt stays on the display and the electrical power does not shut off resulting in battery drain unless you constantly mess

with the shifter until it removes the shift to park display. My first encounter with the dealer is Monday and was told they can't work on it if they can not replicate the issue. Sometimes it goes a week without doing it so who knows. Been doing this about 3 weeks now."

- June 27, 2023 (NHTSA ID NUMBER: 11529062) (2020 Malibu): "After you shift the car into park and shut the motor off, the car flashes a warning on the instrument panel to shift the car into park. Which it already is. Appears there was a recall for this for 2016-2019 cars, but not the 2020 year like mine. Happens consistently."

- July 6, 2023 (NHTSA ID NUMBER: 11530779) (2021 Malibu): "Every time I parked the car, the dashboard will light up and give me a message to " SHIFT TO PARK" I have read that this can means a malfunction in my transmission or it could be a sensor. I have also read that this type of cars have a recalls on 2016-2019. I just purchased this car Aug of 2022"

- July 10, 2023 (NHTSA ID NUMBER: 11531404) (2022 Trailblazer): "Upon shutting off the ignition, my car tells me to 'shift to park' each time and it is already in park. Takes several minutes for it to finally register that is already in park."

- July 25, 2023 (NHTSA ID NUMBER: 11534337) (2021 Malibu): "Malibu will be in park, engine off, but when exiting the vehicle a message will appear 'SHIFT TO PARK', although the vehicle is in park. The electrical will not shut off, which is a hazard, as the vehicle's battery remains on. I am forced to turn the car on, shift to a different position (not "park", and then forcefully shift back to park). I contacted the dealer that has done all of my work, they were aware of the problem and offered to fix under warranty. They claim to have replaced my transmission harness. The problem was fixed for about one week, but now the problem has resumed sporadically. I have contacted the dealer again as of this morning to seek resolution. The consumer stated that the manufacturer has not resolved the issue yet."

- July 19, 2023 (NHTSA ID NUMBER: 11533316) (2022 Trailblazer): "When I park my car, I get a warning to 'shift to park' even though my car is in park. This prevents me from turning off my car."

- July 22, 2023 (NHTSA ID NUMBER: 11533872) (2020 Malibu): "Since last year I am having this problem in this car, even after parking the car, it is giving an error of 'shift to park', I have already taken it to the car dealership twice to fix this problem and still the problem is not getting fixed in the car. Not even that I live in California and while coming back from Vegas last year, this car suddenly stopped working while on the freeway, luckily I was near truck station so I stopped the car. This is a new car and I didn't even drive 36000 miles on it and it is giving me problems. This car is a

serious problem and I would request nhtsa to please step in and take action regarding the manufacturers."

- August 12, 2023 (NHTSA ID NUMBER: 11538109) (2022 Trailblazer): "When vehicle is in park and you try to shut it off, you get the error message "Shit to Park" and you are unable to shut the vehicle off. You have to switch between the gears a few times before the vehicle shuts off. I've done this a few times and have even been late for work because the car won't shut off."

- August 14, 2023 (NHTSA ID NUMBER: 11538369) (2022 Trailblazer): "WHEN YOU SHIFT TO PARK A MESSAGE COMES UP AND SAYS SHIFT TOPARK WHEN IT IS ALREADY IN PARK. THE MAIN PROBLEM IS THE VEHICHCLE WILL NOT SHUT OFF. YOU HAVE TO DO MANY DIFFERANT THINGS TO TRY TO GET THE MESSAGE TO LEAVE AND THEN IT WILL CUT OFF. THIS HAS BEEN HAPPENING NOW SINCE IT HIT 29700 MILES AND DOES IT ALMOST EVERYTIME WE DRIVE IT NOW. THERE IS A SERIOUS PROBLEM HERE IF YOU CANT SHUT OFF THE VEHICLE . I ALSO NOTICED MANY OTHER PEOPLE HAVING THE SAME ISSUE WITH THE TRAILBLAZERS. THIS NEEDS A RECALL FIX."

- August 17, 2023 (NHTSA ID NUMBER: 11539117) (2022 Trailblazer): "The shift to park feature on this vehicle keeps on displaying on the screen when the vehicle is in park and is trying to be turned off."

- September 10, 2023 (NHTSA ID NUMBER: 11543689) (2021 Malibu): "When I move my car to park and shut off the vehicle it shows a "shift to park" message. This keeps my car from shutting off on a regular basis."

- September 12, 2023 (NHTSA ID NUMBER: 11543993) (2020 Traverse): "When the vehicle is shifted into "Park" the information system reports an error code "shift into park" and prevents the vehicle from being turned off. On the opposite side of the spectrum, there are times when the vehicle fails to start with error code displayed "shift into park" even though the vehicle is infact in park. The error code is sometimes resolved when the shifter levers forward facing button is actuated multiple times. This false error code is a grave safety concern as it build complacency within the operators. This could potentially lead to an operator ignoring a true "shit into park" error code as a false one and exiting the vehicle while it is actually in gear or neutral and cause death or injury to an innocent bystander or the operator! Please investigate this error as it has apparently existed and been well documented in the Chevrolet Traverse since at least 2018. Yet Chevrolet still fails to acknowledge or resolve it!"

- September 13, 2023 (NHTSA ID NUMBER: 11544315) (2020 Malibu): "Warning messages such as put car in park will appear while the car is in park, steering unstable

, low fuel a many others . This is a hazard and I only had the vehicle for 1 year, however I reported the first issue in April 2023 to dealer of purchase an no fix at this time ."

- September 22, 2023 (NHTSA ID NUMBER: 11545984) (2022 Traverse): "On multiple occasions the vehicle will not turn off due to the shift to park preventing the engine from turning off. If the operator is in a garage and needs to turn the engine off this will prevent the operator from turning it off and could cause injury or death due to vehicle exhaust. I currently have it at the Chevy dealership for warranty repair but I'm not sure if they will cover it."

- October 4, 2023 (NHTSA ID NUMBER: 11548240) (2022 Traverse): "The contact owns a 2022 Chevrolet Traverse. The contact stated that while shifting the transmission into park (P), the vehicle failed to park. The 'Shift to Park' message was displayed. Additionally, the vehicle inadvertently and aggressively lunged backward while stopped. The vehicle was taken to the dealer, where the transmission was replaced and repairs were performed on the exhaust system; however, the failure recurred with the vehicle making an abnormal sound while driving. Additionally, the contact stated that her daughter suffered shortness of breath and dizziness while asleep inside the vehicle, which she later received medical attention for. Upon inspection, the contact noticed there was a leak in the exhaust system. The vehicle was taken back to the dealer, and the contact was informed that the exhaust pipe had a leak and needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure. The failure mileage was approximately 6,000.

- October 15, 2023 (NHTSA ID NUMBER: 11550058) (2021 Malibu):  "When I parked my car and tried to turn off the ignition, a warning buzzer kept beeping and a warning on the dash was telling me to 'shift to park'. I moved the shifter numerous times to make sure it was in park, but the warning continued. This happened several times now. A few times the warning went off after I wiggled the shifter knob numerous times, but not always."

- October 18, 2023 (NHTSA ID NUMBER: 11550560) (2020 Malibu):  "Started today, I would put my car in park and I'd would display in the dashboard 'Shift to Park' even though I'm already in park. I tried to turn my car on and off and switch gears but everytime I turn it off and it's in park, it would keep reading that message. It eventually stopped but I don't want this to keep happening."

- October 22, 2023 (NHTSA ID NUMBER: 11551252) (2022 Malibu): "When trying to stop park and turn off my car it will display an error message saying shift to park. This first started about a week ago and I constantly have to turn the car on and off while I am trying to wiggle the shifter in an effort to get it to acknowledge that the car is parked so I can get out. This has also caused me to be stuck in the car for about 5

minutes on a good day to 20 minutes on a bad as I am unable to turn the car off. I am worried that when I leave the car it will roll away into traffic or stop at working in a busy intersection."

- October 26, 2023 (NHTSA ID NUMBER: 11551977) (2022 Trailblazer): "'shift to park' on my dash screen preventing me from locking my car and the accessories all remain on. I have to disconnect my battery otherwise my car dies if it remains on. I reconnect the battery regardless of how long it has been disconnected and the same shift to park issue reappears this first happened 10/24/23 and again today 10/26/23"

- November 3, 2023 (NHTSA ID NUMBER: 11553473) (2021 Malibu): "When trying to turn the car off, it will not allow me, warning light comes on saying shift to park. This has happened several times over the past week. I have to continuously turn the car on and off, put in drive then back to park before the message goes away, allowing me to turn off the car. I am 3k miles out of my bumper to bumper warranty, so the dealership is charging me $500.15 for a new shifter assembly for what they said was a common failure in GM cars. If its common then it should be a recall for several make and model years. My coworker has 2021 Blazer and the same thing happened to her but she was still under warranty so her repair cost $0.

- November 14, 2023 (NHTSA ID NUMBER: 11555103) (2022 Trailblazer):  "The contact stated that months later, upon starting the vehicle, the 'Shift to Park' message was displayed and the vehicle failed to recognize that the shifter was still in park(P). The check engine and ABS warning lights were illuminated. The vehicle was taken to the dealer, who determined that the braking system needed to be updated and that the gear shifter needed to be replaced. The vehicle was not repaired. The manufacturer was notified of the failure but provided no assistance. The failure mileage was 15,000."

- November 27, 2023 (NHTSA ID NUMBER: 11556987) (2021 Malibu): "The contact owns a 2021 Chevrolet Malibu. The contact stated that when the gear shifter was shifted into park(P), the vehicle started to roll. The contact stated that the shift to park message was then illuminated. The contact turned off and restarted the vehicle. The vehicle was taken to the dealer but was not diagnosed or repaired by an independent mechanic or dealer. The manufacturer was not made aware of the failure. The failure mileage was approximately 66,000.

- January 3, 2024 (NHTSA ID NUMBER: 11563211) (2022 Malibu): "When shifting into park, an error message shows as 'shift to park'. This isn't every time I shift into park, but when it does occur, I have to shift into reverse and then drive (possibly several times) before the transmission acknowledges the 'park' designation. I do not believe I can exit my vehicle safely as the transmission may allow the vehicle to disengage and move from the parking area causing damage to something or someone."

- January 14, 2024 (NHTSA ID NUMBER: 11565480) (2021 Malibu): "I was parking and when I parked my dashboard popped up saying shift to park when it's in park. My car won't turn off .. tired to turn it off but it can't I moved the car back and forth and put on park and nothing.. I know this is an ongoing issue because on my other Malibu that I purchased had that problem and now on my 2021 Chevy Malibu has that issue now. Thank god I wasn't somewhere else stranded because it was below 0 in Chicago."

- January 22, 2024 (NHTSA ID NUMBER: 11566883) (2022 Trailblazer): "Shift to park" alert. It started after the car had 29,000 miles. It would occur occasionally but on Jan 4th of this year, I had to restart and move my car 11 times in order for the alert to be cancelled and I was able to shut off my car. I have been told there is no parts available by the dealer who has my car and they don't know when the work will be done!"

- January 26, 2024 (NHTSA ID NUMBER: 11568066) (2022 Trailblazer): "Car will not allow me to fully turn off vehicle, keeps sending message 'shift to park'."

- January 31, 2024 (NHTSA ID NUMBER: 11569147) (2022 Malibu): "When the vehicle is put into park and turned off, it will sometimes say the vehicle is not in park and to put the vehicle into park. I am unsire if it is a sensor failing or if the vehicle really is not truly in park, although the indicator on the dash shows P. This is a concern because if it is in fact not actually parked, the car can roll away when exiting."

- February 7, 2024 (NHTSA ID NUMBER: 11570639) (2022 Trailblazer): "Shift Park issue - I bought the car 10 days ago and now start to have an issue when I park the car, put the car in the parking mode and turn off. The car doesn't turn off as the message shift park is on. I need to turn on again, move, go back, change for drive and park and finally allow me to turn it off. I read it's a common issue in 2022 Chevrolet Trailblazers."

- February 22, 2024 (NHTSA ID Number: 11573516) (2022 Trailblazer): "My 2022 Trailblazer has had a shift to park issue. It's hazardous as I have to constantly park my car in reverse to get the 'shift to park' message off my dashboard screen. My car doesn't shut off properly with this issue. My car is only at 19,700 miles. It should not be having this issue."

- March 1, 2024 (NHTSA ID Number: 11574930) (2021 Malibu): ""Shift to Park" message appears in the car's Driver Information Center, even when it is already in Park. It doesn't recognize that the vehicle is in park. I have to wiggle the gear several times before the message clears. It doesn't allow me to lock my vehicle when this happens, I believe the vehicle stays on while this message is on the DIC, making it

very unsafe. I see that there are several complaints about this issue but no recall has been made. The dealer refuses to do a free diagnostic test knowing that these vehicles have had issues. My vehicle is no longer under warranty at 54,000 miles, I will be out of pocket the expense but it's definitely unfair that this has not been an issue recalled by GM."

- March 1, 2024 (NHTSA ID Number: 11574807) (2021 Malibu): "Every time I shift my car into park and try to power it off I get a warning saying shift car to park when already in park. Now I'm afraid that one day the car will display the shift gear improperly and the car will start to move on it own causing the safety anyone around it."

- March 19, 2024 (NHTSA ID Number: 11578210) (2020 Malibu): "Where the warnings appear, it keeps saying shift to park. If this continues the car battery will not work."

- March 22, 2024 (NHTSA ID Number: 11578875) (2022 Traverse): "About 1 week ago, I began getting "Shift To Park" warnings/notifications when I would park the car and turn off the engine. To make it stop, I usually have to turn the car back on, shift to a different gear, shift back to Park, wiggle the gear shift around side to side and back and forth within the Park gear. Sometimes it will have remedied when I attempt to turn the car off the second time, and other times I need to do the same procedure again. In looking it up online, this is a known issue, and an ongoing issue, with GM vehicles over the past several years with no fix or attention to mandate a correction. This seems to effect GM vehicles of multiple models and can allow the vehicle to roll (and my driveway is a small hill on the top of the hill/cul d' sac that we live in). When it fails to recognize the vehicle is in Park, I cannot exit the car, the alerts and chimes continue and would ultimately drain my battery if it failed to recognize that it was in Park. I do have an appointment scheduled for the dealership to check since I am under warranty still. My vehicle only has less than 29,000 miles and is not driven on rough or challenging terrain, with local drives of less than 10 miles generally. Only 1 driver for this vehicle as well."

55.     Owners have also been complaining about the Shift to Park Defect on vehicle enthusiast forums. For instance, on August 5, 2022, a 2021 Trailblazer owner posted on a Trailblazer enthusiast website that they were experiencing the shift to park issue.  The post drew more than 100 responses with other owners confirming they too experienced the defect and that they were often as denied repairs by dealerships or dealers' attempted repairs did not fix the issue.  *See*  https://www.trailblazertalk.com/threads/shift-to-park-error-message.1000/  (last

visited April 2, 2024). Owners of Malibu Class Vehicles have made similar complaints online. *See, e.g.,* https://www.chevymalibuforum.com/threads/shift-to-park.125880/ (last visited April 2, 2024); https://www.reddit.com/r/volt/comments/17z6z17/2022_malibu_shift_to_park/ ("Have a 2022 Chev. Malibu with under 16,000 miles. Have had this problem since June of this year. First time they "fixed" it they said it was the shifter and sent for part. It was replaced on July 5,had same problem just after and had to bring it back in on Sept.12, needed a loaner. Picked it up and they said thy could not duplicate the problem. So it shut off for them and they did nothing. Guess what, same problem . . . .") (last visited April 2, 2024).

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### *Barbie Green*

56.     On January 26, 2022, Plaintiff Barbie Green ("Plaintiff Green") purchased a new 2022 Chevrolet Traverse vehicle, Vehicle Identification Number 1GNEVHKW8NJ117387 (hereafter the "Green Vehicle") from Landers Chevrolet of Norman, an authorized GM dealership located in Norman, Oklahoma.

57.     At the time of sale, Landers Chevrolet of Norman assured Plaintiff Green that the vehicle was accompanied by GM's New Vehicle Limited Warranty.   The dealership, however, did not disclose the existence of the Defect to Plaintiff.   Nor did GM disclose the existence of the Defect in promotional materials, on the window sticker affixed to the vehicle, on its website, or elsewhere.

58.     In 2023, the Green Vehicle began experience the symptoms of the Shift to Park Defect, i.e., when Plaintiff Green placed the vehicle in park and attempted to turn it off, the vehicle would not shut off and the instrument cluster displayed the 'Shift to Park' message.

59.     On or about September 24, 2023, Plaintiff Green presented the vehicle to Lynn Smith Chevrolet, a GM dealership located in Burleson, Texas, and sought a repair regarding the Defect.  In response, the dealership attempted a repair by replacing the transmission control.

60.     However, within weeks of the repair attempt the vehicle continued to experience the Defect and display the Shift to Park message.

61.     On February 9, 2024, Plaintiff Green provided GM with written notice regarding the defect in her vehicle and her claims for violations of the Oklahoma Consumer Protection Act, breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, and unjust enrichment.  The notice stated that all Class Vehicle models suffer from defective shifter assemblies.

### *Karen Malmkar*

62.     On September 13, 2021, Plaintiff Karen Malmkar ("Plaintiff Malmkar") purchased a new 2022 Chevrolet Trailblazer vehicle, Vehicle Identification Number KL79MRSL5NB013472 (hereafter the "Malmkar Vehicle") from Jerry Remus Chevrolet, an authorized GM dealership located in North Platte, Nebraska.

63.     At the time of sale, Jerry Remus Chevrolet assured Plaintiff Malmkar that the vehicle was accompanied by GM's New Vehicle Limited Warranty.  The dealership, however, did not disclose the existence of the Defect to Plaintiff.  Nor did GM disclose the existence of the Defect in promotional materials, on the window sticker affixed to the vehicle, on its website, or elsewhere.

64.     In 2023, the Malmkar Vehicle began experience the symptoms of the Shift to Park Defect, i.e., when Plaintiff Malmkar placed the vehicle in park and attempted to turn it off, the vehicle would not shut off and the instrument cluster displayed the 'Shift to Park' message.

65.     In or around November 2023, Plaintiff's husband presented the vehicle to AutoNation Chevrolet, an authorized GM dealership located in Waco, Texas, and sought a repair regarding the Defect.   In response, the dealership declined to attempt a repair under warranty.   Instead, the dealership stated that (1) it would cost approximately $2,000 out-of-pocket for the dealership to attempt to repair the Defect; and (2) replacement parts were currently on backorder.

66.     On February 9, 2024, Plaintiff Malmkar provided GM with written notice regarding the defect in her vehicle and her claims for violations of the Nebraska Deceptive Trade Practices Act, breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, and unjust enrichment. The notice stated that all Class Vehicle models suffer from defective shifter assemblies.

### _Maria Garza_

67.     In March 2022, Plaintiff Maria Garza ("Plaintiff Garza") purchased a new 2022 Chevrolet Traverse vehicle, Vehicle Identification Number 1GNERJKW0NJ139024 (hereafter the "Garza Vehicle") from Jerry Durant Chevrolet Buick GMC, an authorized GM dealership located in Granbury, Texas.

68.     At the time of sale, Jerry Durant Chevrolet Buick GMC assured Plaintiff Garza that the vehicle was accompanied by GM's New Vehicle Limited Warranty.   The dealership, however, did not disclose the existence of the Defect to Plaintiff.   Nor did GM disclose the existence of the Defect in promotional materials, on the window sticker affixed to the vehicle, on its website, or elsewhere.

69.     Thereafter, the Garza Vehicle began experience the symptoms of the Shift to Park Defect, i.e., when Plaintiff Garza placed the vehicle in park and attempted to turn it off, the vehicle would not shut off and the instrument cluster displayed the 'Shift to Park' message.

70.    In the summer of 2023, Plaintiff Garza presented her vehicle to Bruner Chevy GMC, an authorized GM dealership located in Early, Texas and sought a repair regarding the Defect.  In response, the dealership told Plaintiff Garza that it would not perform a repair regarding the defect under warranty.  Instead, the dealer told Plaintiff Garza that she would have to pay approximately $800-1,000 out-of-pocket for the dealership to attempt a repair.

71.    On February 9, 2024, Plaintiff Garza provided GM with written notice regarding the defect in her vehicle and her claims for violations of the Texas Deceptive Trade Practices Act, breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, and unjust enrichment. The notice stated that all Class Vehicle models suffer from defective shifter assemblies.

### *Glenda Brown*

72.    In March 2022, Plaintiff Glenda Brown ("Plaintiff Brown") purchased a new 2022 Chevrolet Trailblazer vehicle, Vehicle Identification Number KL79MVSL4NB075941 (hereafter the "Brown Vehicle") from Ed Morse Chevrolet Lebanon ("Ed Morse"), an authorized GM dealership located in Lebanon, Missouri

73.    At the time of sale, Ed Morse assured Plaintiff Brown that the vehicle was accompanied by GM's New Vehicle Limited Warranty.  The dealership, however, did not disclose the existence of the Defect to Plaintiff.  Nor did GM disclose the existence of the Defect in promotional materials, on the window sticker affixed to the vehicle, on its website, or elsewhere.

74.    Thereafter, the Brown Vehicle began experience the symptoms of the Shift to Park Defect, i.e., when Plaintiff Brown placed the vehicle in park and attempted to turn it off, the vehicle would not shut off and the instrument cluster displayed the 'Shift to Park' message.

75.     For instance, in or around November 2022, when the vehicle's approximate mileage was 7,700 miles and Plaintiff Brown was more than 200 miles away from her home, her vehicle manifested the Shift to Park Defect and Plaintiff Brown had to spend twenty (20) minutes trying to get her vehicle to recognize it was in park.

76.     On or about November 4, 2022, Plaintiff Brown presented her vehicle to Stan McNabb of Columbia, an authorized GM dealership located in Columbia, Tennessee and sought a repair regarding the Defect.  In response, the dealership attempted a repair by replacing the vehicle's battery.

77.     However, the Defect manifested again after the repair attempt.

78.     On April 2, 2024, Plaintiff Brown provided GM with written notice regarding the defect in her vehicle and her claims for violations of the Missouri Merchandising Practices Act,  breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, and unjust enrichment. The notice stated that all Class Vehicle models suffer from defective shifter assemblies.

### *Michelle Crosier*

79.     On August 13, 2021, Plaintiff Michelle Crosier ("Plaintiff Crosier") purchased a new 2022 Chevrolet Trailblazer vehicle, Vehicle Identification Number KL79MUSL9NB017687 (hereafter the "Crosier Vehicle") from Durand Chevrolet ("Durand"), an authorized GM dealership located in Hudson, Massachusetts.

80.     At the time of sale, Durand assured Plaintiff Crosier that the vehicle was accompanied by GM's New Vehicle Limited Warranty.  The dealership, however, did not disclose the existence of the Defect to Plaintiff.  Nor did GM disclose the existence of the Defect in promotional materials, on the window sticker affixed to the vehicle, on its website, or elsewhere.

81.     Thereafter, in or around August 2023 the Crosier Vehicle began experiencing the symptoms of the Shift to Park Defect, i.e., when Plaintiff Crosier placed the vehicle in park and attempted to turn it off, the vehicle would not shut off and the instrument cluster displayed the 'Shift to Park' message.  Plaintiff Crosier has been required to spend as much as twenty minutes manipulating the shifter in order to get the vehicle to recognize it is in Park. As a result, she has been late to work due to the defect.

82.     On September 15, 2023, Plaintiff Crosier presented her vehicle to Diamond Chevrolet Buick GMC Cadillac ("Diamond"), an authorized GM dealership located in Auburn, Massachusetts and sought a repair regarding the Defect.  The dealership did not have any replacement parts available to attempt a repair regarding the Defect. Instead, Plaintiff Crosier paid more than $700 out of pocket for the dealership to order the replacement part.

83.     Thereafter, Plaintiff Crosier called Diamond approximately once a month to check on the status of the replacement part while her vehicle continued to suffer from the defect.

84.     Diamond did not install the replacement part until March 22, 2024.

85.     On March 27, 2024, Plaintiff Crosier provided GM with written notice regarding the defect in her vehicle and her claims for violations of the Massachusetts Consumer Protection Act, breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, and unjust enrichment. The notice stated that all Class Vehicle models suffer from defective shifter assemblies.

## CLASS ACTION ALLEGATIONS

**A.  The Class**

86.     Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class**: All persons or entities who purchased or leased a 2021-2023 Chevrolet Trailblazer, 2020-2022 Chevrolet Traverse, 2020-2023 Chevrolet Malibu or 2020-2023 Buick Encore vehicle in the United States.

87.     In the alternative to the Nationwide Class, and pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiffs seek to represent the following state-specific classes (collectively the "State Classes"):

**Massachusetts Class**: All persons or entities who purchased or leased a 2021-2023 Chevrolet Trailblazer, 2020-2022 Chevrolet Traverse, 2020-2023 Chevrolet Malibu or 2020-2023 Buick Encore vehicle in the Commonwealth of Massachusetts.

**Missouri Class**: All persons or entities who purchased or leased a 2021-2023 Chevrolet Trailblazer, 2020-2022 Chevrolet Traverse, 2020-2023 Chevrolet Malibu or 2020-2023 Buick Encore vehicle in the State of Missouri.

**Nebraska Class**: All persons or entities who purchased or leased a 2021-2023 Chevrolet Trailblazer, 2020-2022 Chevrolet Traverse, 2020-2023 Chevrolet Malibu or 2020-2023 Buick Encore vehicle in the State of Nebraska.

**Oklahoma Class**: All persons or entities who purchased or leased a 2021-2023 Chevrolet Trailblazer, 2020-2022 Chevrolet Traverse, 2020-2023 Chevrolet Malibu or 2020-2023 Buick Encore vehicle in the State of Oklahoma.

**Texas Class**: All persons or entities who purchased or leased a 2021-2023 Chevrolet Trailblazer, 2020-2022 Chevrolet Traverse, 2020-2023 Chevrolet Malibu or 2020-2023 Buick Encore vehicle in the State of Texas.

88.     Defendant and its employees or agents are excluded from the Class.

**B.  Numerosity**

89.     Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that tens or hundreds of thousands of Class Vehicles have been sold and leased in the relevant states.

**C.  Common Questions of Law and Fact**

90.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members.  These questions include:

a.    Whether the Class Vehicles were sold with defective transmission shifter assemblies that fail to recognize when the shifter has been placed in the "Park" position and displayed a 'Shift to Park' message;

b.    When Defendant learned about the defective nature of the Class Vehicles' shifter assemblies;

c.    Whether Defendant had a duty to disclose the defective nature of the Class Vehicles shifter assemblies to owners and lessees;

d.    Whether Defendant had an obligation to repair the defective shifter assemblies under its warranty;

e.    Whether the defective shifter assemblies render the Class Vehicle unmerchantable at the time of sale;

f.    Whether Defendant is liable for damages, and the amount of such damages; and

g.    Whether Plaintiff and class members are entitled to equitable relief including injunctive relief.

**D.  Typicality**

91.    Plaintiffs' claims are typical of the claims of the Class since Plaintiffs purchased Class Vehicles, as did each member of the Classes.  Furthermore, Plaintiffs and all members of the Class sustained economic injuries arising out of Defendant's wrongful conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

**E.  Protecting the Interests of the Class Members**

92.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in handling class actions and claims involving unlawful business practices.  Neither Plaintiffs nor their counsel have any interest which might cause them not to vigorously pursue this action.

**F.  Proceeding Via Class Action is Superior and Advisable**

93.    A class action is the superior method for the fair and efficient adjudication of this controversy.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them.  Even if the members of the Classes could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia,* Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

94.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Classes as a whole.

**FIRST CAUSE OF ACTION**

**Breach of Implied and Express Warranties Pursuant to the Magnuson-Moss Warranty
Act, 15 U.S.C. §2301,** *et seq.*
**(Plaintiffs on behalf of the Nationwide Class or the alternative the State Classes)**

95.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint
as though fully stated herein.

96.    Plaintiffs and members of the Nationwide Class are each "consumers" as defined
in 15 U.S.C. § 2301(3).

97.    Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and
(5).

98.    The Class Vehicles are each a "consumer product" as defined in 15 U.S.C.
§ 2301(6).  15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged
by the failure of a warrantor to comply with the written and implied warranties.

99.    15 U.S.C. § 2304(a)(1) requires Defendant, as a warrantor, to remedy any defect,
malfunction or nonconformance of the Class Vehicles within a reasonable time and without
charge to the Plaintiffs and Class members.

100.    Defendant's sale of the defective Class Vehicles and its failure and/or refusal to
repair the Class Vehicles' defective shifter assemblies under its warranty constitute breaches of
the written and implied warranties applicable to the Class Vehicles.

101.    As a result of Defendant's breaches of the written and implied warranties, and
Defendant's failure to remedy the same within a reasonable time, Plaintiffs and class members
have suffered damages.

**SECOND CAUSE OF ACTION**
**Fraudulent Concealment**
**(Plaintiffs on behalf of the Nationwide Class or in the alternative the State Classes)**

102.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

103.    Prior to selling the Class Vehicles to Plaintiffs and the members of the Classes, Defendant knew that the Class Vehicles suffered from the Shift to Park Defect.

104.    By failing to disclose and concealing the Shift to Park Defect from Plaintiffs and Class Members, Defendant concealed and suppressed material facts concerning the performance and quality of the Class Vehicles.

105.    Defendant was under a duty to Plaintiffs and the Class Members to disclose the Shift to Park Defect and/or the associated repair costs because:

    a.    Defendant was in a superior position to know the true state of facts about the Class Vehicles' Shift to Park Defect;

    b.    Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use;

    c.    Defendant knew that the Shift to Park Defect entailed costly repairs;

    d.    Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their vehicles have the Shift to Park Defect until after they purchased the Class Vehicles; and/or

    e.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and the Shift to Park Defect.

32

106.    On information and belief, Defendant still has not made full and adequate disclosures, and continues to defraud consumers by concealing material information regarding the Shift to Park Defect and the performance and quality of Class Vehicles.

107.    The facts concealed or not disclosed by Defendant to Plaintiffs and Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

108.    Plaintiffs and the Class relied on Defendant to disclose material information it knew, such as the Shift to Park Defect in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

109.    By failing to disclose the Shift to Park Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

110.    The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

111.    Had Plaintiffs and other Class Members known that the Class Vehicles suffer from the Shift to Park Defect, they would not have purchased the Class Vehicles or would have paid less for them.

112.    Plaintiffs and the other Class Members are reasonable consumers who do not expect that their vehicles will not recognize when the shifter assemblies have been placed in park, which is the reasonable and objective consumer expectation for vehicles.

113.    As a result of Defendant's misconduct, Plaintiffs and the other Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles and their shifter assemblies are defective and require repairs or replacement, and are worth less money because of the Shift to Park Defect.

114. Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

115. Defendant's actions and omissions were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class Members' rights and well-being, to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

116. Furthermore, as the intended and expected result of its fraud and conscious wrongdoing, Defendant has profited and benefited from Plaintiffs' and Class Members' purchase of Class Vehicles containing the Shift to Park Defect. Defendant has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of Defendant's misconduct alleged herein, Plaintiffs and Class Members were not receiving vehicles of the quality, nature, fitness, or value that had been represented by Defendant, and that a reasonable consumer would expect.

117. Defendant has been unjustly enriched by its fraudulent, deceptive, and otherwise unlawful conduct in connection with the sale and lease of Class Vehicles, and by withholding benefits from Plaintiffs and Class Members at the expense of these parties. Equity and good conscience militate against permitting Defendant to retain these profits and benefits, and Defendant should be required to make restitution of its ill-gotten gains resulting from the conduct alleged herein.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**(Plaintiffs on behalf of the Nationwide Class or in the alternative the State Classes)**

118. Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

119.    Defendant has long known that about the Shift to Park Defect which it concealed and failed to disclose to Plaintiffs and Class Members.

120.    As a result of its fraudulent acts, and omissions related to the Shift to Park Defect, Defendant obtained monies which rightfully belong to Plaintiffs, and the Class Members to the detriment of Plaintiffs, and Class Members.

121.    Defendant appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the proposed Class Members who, without knowledge of the Shift to Park Defect, paid a higher price for their vehicles which actually had lower values.  Defendant also received monies for vehicles that Plaintiffs and the Class Members would not have otherwise purchased or leased.

122.    It would be inequitable and unjust for Defendant to retain these wrongfully obtained profits.

123.    Defendant's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

124.    As a result of Defendant's unjust enrichment, Plaintiffs, and Class Members have suffered damages.

125.    Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

126.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with misleading information concerning the Shift to Park Defect; compelling Defendant to provide Class

members with adequate repairs or with replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**FOURTH CAUSE OF ACTION**
**Violation of the Texas Deceptive Practices Act**
**Tex. Bus. & Com. Code § 17.41,** *et seq.*
**(Plaintiff Garza on behalf of the proposed Texas Class)**

127.    Plaintiff Garza incorporates by reference all allegations contained in this Complaint as though fully stated herein.

128.    The Garza Vehicle and the Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattel that were purchased or leased for use.

129.    Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

130.    Plaintiff Garza and the Texas Class Members are "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired their vehicle by purchase.

131.    At all relevant times, Defendant has engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

132.    The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, et seq.

133.    By failing to disclose and concealing the defective nature of the Class Vehicles' shifter assemblies from Plaintiff Garza and prospective Texas Class Members, Defendant violated the Texas Deceptive Practices Act as it represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

134.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

135.    Defendant knew that the Class Vehicles suffered from an inherent Shift to Park Defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

136.    Defendant was under a duty to Plaintiff Garza and the Texas Class Members to disclose the defective nature of the Class Vehicles' shifter assemblies and/or the associated repair costs because:

a.    Defendant was in a superior position to know the true state of facts about the Shift to Park Defect contained in the Class Vehicles;

b.    Plaintiff Garza and the Texas Class Members could not reasonably have been expected to learn or discover that the shifter assemblies in their Class Vehicles were defective until after they purchased the Class Vehicles; and,

c.    Defendant knew that Plaintiff Garza and the Texas Class Members could not reasonably have been expected to learn about or discover the Shift to Park Defect.

137.    The facts concealed or not disclosed by Defendant to Plaintiff Garza are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the subject vehicle.

138.    Plaintiff Garza and the Texas Class relied on Defendant to disclose material information it knew, such as the defective nature of the shifter assemblies in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

139.    By failing to disclose the Shift to Park Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

140.    Moreover, Defendant's intentional concealment of and failure to disclose the Shift to Park Defect constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff Garza and the Texas Class, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Garza and the Texas Class.

141.    The facts concealed or not disclosed by Defendant to Plaintiff Garza and the other Texas Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

142.    Had Plaintiff Garza and other Texas Class Members known that the Class Vehicles' shifter assemblies were defective, they would not have purchased the Class Vehicles or would have paid less for them.

143.    In addition, Defendant is also liable under Tex. Bus. & Com. Code § 17.50(a) because Defendant's breach of the implied warranty of merchantability was a producing cause of economic damages sustained by Plaintiff Garza and the Texas Class.

144.    Plaintiff Garza and the other Texas Class Members are reasonable consumers who do not expect that their vehicles will suffer from a Shift to Park Defect.

145.    As a result of Defendant's misconduct, Plaintiff Garza and the other Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles and their shifter assemblies are defective and require repairs or replacement and are worth less money because of the Defect.

146.    Plaintiff Garza has provided adequate notice to Defendant.

147.    Plaintiff Garza  and the Texas Class should be awarded three times the amount of their economic damages because Defendant intentionally concealed and failed to disclose the defective nature of the Class Vehicles

**FIFTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability Pursuant to**
**Tex. Bus. & Com. Code § 2.314**
**(Plaintiff Garza on behalf of the proposed Texas Class**

148.    Plaintiff Garza incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

149.    Defendant is a merchant with respect to motor vehicles.

150.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff Garza and the Texas Class members.

151.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

152.    Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Garza and Texas class members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a Shift to Park Defect that can make driving unreasonably dangerous and can prevent owners and lessees from reliably turning off their vehicles.

153.    As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

### SIXTH CAUSE OF ACTION
**Violation of the Oklahoma Consumer Protection Act, Okla. Stat. Ann. tit. 15, § 751**
**(Plaintiff Green on behalf of the Oklahoma Class)**

154.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

155.    It is a violation of the Oklahoma Consumer Protection Act when, *inter alia,* a person, in the course of the person's business, commits an unfair or deceptive trade practice as defined in Section 752. Okla. Stat. Ann. tit. 15, § 753(20).  Section 752, in turn, defines a deceptive trade practice as "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person. Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral," and defines an unfair trade practice as  "any practice which offends

established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and Okla. Stat. Ann. tit. 15, § 752(13 & 14)

156.    "The commission of any act or practice declared to be a violation of the Consumer Protection Act shall render the violator liable to the aggrieved consumer for the payment of actual damages sustained by the customer and costs of litigation including reasonable attorney's fees, and the aggrieved consumer shall have a private right of action for damages, including but not limited to, costs and attorney's fees." Okla. Stat. Ann. tit. 15, § 761.1.

157.    The allegations set forth herein constitute false, misleading, deceptive and/or unfair trade acts or practices.

158.    By failing to disclose and concealing the Shift to Park Defect from Plaintiff Green and Oklahoma Class Members, Defendant represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised.

159.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

160.    Defendant knew that the Class Vehicles' shifter assemblies suffered from an inherent defect, were defectively manufactured or made, would fail prematurely, and were not suitable for their intended use.

161.    Defendant was under a duty to Plaintiff Green and the Oklahoma Class Members to disclose the Shift to Park Defect and/or the associated repair costs because:

    a.    Defendant was in a superior position to know the true state of facts about the

safety defect contained in the Class Vehicles' shifter assemblies;

b.   Plaintiff Green and the Oklahoma Class Members could not reasonably have been expected to learn or discover that their vehicles have defective shifter assemblies until after they purchased the Class Vehicles; and,

c.   Defendant knew that Plaintiff Green and the Oklahoma Class Members could not reasonably have been expected to learn about or discover the Shift to Park Defect.

162.   The facts concealed or not disclosed by Defendant to Plaintiffs Green and Oklahoma Class Members are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Class Vehicles.

163.   Plaintiff Green and the Oklahoma Class relied on Defendant to disclose material information it knew, such as the defective nature of the shifter assemblies in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

164.   By failing to disclose the Shift to Park Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

165.   The facts concealed or not disclosed by Defendant to Plaintiff Green and the Oklahoma Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

166.   Had Plaintiff Green and Oklahoma Class Members known that the Class Vehicles' shifter assemblies were defective, they would not have purchased the Class Vehicles or would have paid less for them.

167.   Plaintiff Green and the Oklahoma Class Members are reasonable consumers

who do not expect that their vehicles will suffer from a Shift to Park Defect.

168.    As a result of Defendant's misconduct, Plaintiff Green and the Oklahoma Class Members have been harmed and have suffered actual and economic damages in that the Class Vehicles and their shifter assemblies are defective and require repairs or replacement and are worth less money because of the Defect.

169.    Plaintiff Green has provided adequate notice to Defendant.

170.    Plaintiff Green and the Oklahoma Class should be awarded three times the amount of their economic damages because Defendant intentionally concealed and failed to disclose the defective nature of the Class Vehicles

### SEVENTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability Pursuant to Okla. Stat. Ann. tit. 12A, § 2-314**
**(Plaintiff Green on behalf of the Oklahoma Class)**

171.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

172.    Defendant is a merchant with respect to motor vehicles.

173.    The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff Green and the Oklahoma Class members.

174.    An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

175.    Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Green and the Oklahoma class members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary

purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from the Shift to Park Defect that can make driving unreasonably dangerous and unreliable.

176.     As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

### EIGHTH CAUSE OF ACTION
**Breach of Express Warranty Pursuant to Okla. Stat. Ann. tit. 12A, § 2-313**
**(Plaintiff Green on behalf of the Oklahoma Class)**

177.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

178.     In connection with the sale or lease of the Class Vehicles, Defendant provided Plaintiff Green and the Oklahoma class members with a New Vehicle Limited Warranty, under which it agreed to provide repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period, excluding slight noise, vibrations, or other normal characteristics of the vehicle, within the first 36 months or 36,000 miles in service, whichever comes first.

179.     Plaintiff Green and the Oklahoma Class members relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

180.     Plaintiff Green and the Oklahoma Class members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the Shift to Park Defect under the vehicle's warranty as described herein.

181.    Plaintiff Green and the Oklahoma Class members have given Defendant a reasonable opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

182.    As a result of said nonconformities, Plaintiff Green and the Oklahoma Class members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

183.    Plaintiff Green and the Oklahoma Class members could not reasonably have discovered said nonconformities with the Class Vehicles prior to their acceptance of the Class Vehicles.

184.    Plaintiff Green and the Oklahoma Class members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Shift to Park Defect.

185.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiff Green and the Oklahoma Class members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

**NINTH CAUSE OF ACTION**
**Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.***
**(Plaintiff Brown on behalf of the Missouri Class)**

186.    Plaintiff Glenda Brown incorporates by reference each and every allegation set forth above as if fully written herein.

187.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense,

misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

188. Defendant, Plaintiff Brown, and Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

189. Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

190. In the course of Defendant's business, Defendant willfully failed to disclose and actively concealed the dangerous risk posed by the Shift to Park Defect in the Class Vehicles.

191. A reasonable American consumer would not expect the Vehicles to suffer from the Shift to Park Defect.

192. Accordingly, Defendant engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices. Defendant's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

193. In purchasing or leasing the Vehicles, Plaintiff Brown and the other Class members were deceived by Defendant's failure to disclose that the vehicles' shifter assemblies were defective.

194. Plaintiff Brown and Class members reasonably relied upon Defendant's misrepresentations and had no way of knowing that said representations were false and materially misleading.

195. Defendant's actions as set forth above occurred in the conduct of trade or

commerce.

196.   Defendant's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

197.   Defendant intentionally and knowingly concealed material facts regarding the Vehicles with intent to mislead Plaintiff Brown and the Class.

198.   Defendant knew or should have known that its conduct violated this statute.

199.   Defendant owed Plaintiff Brown and the Class a duty to disclose the truth regarding the Defect because the Defect affects the safety of the vehicles, entails costly repairs and/or because Defendant: possessed superior/exclusive knowledge of the design of the Vehicles; made incomplete representations regarding the safety and durability of the Vehicles, while purposefully withholding material facts from Plaintiff Brown and the Class that contradicted these representations; and/or intentionally concealed the Defect from Plaintiff Brown and the Class.

200.   Defendant's conduct proximately caused injuries to Plaintiff Brown and the other Class members.

201.   Plaintiff Brown and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiff Brown and the other Class members overpaid for their Vehicles and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

202.   Defendant's violations present a continuing risk to Plaintiff Brown as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

203.   Plaintiff Brown and members of the Class were also harmed by Defendant's

unfair and deceptive trade practices since their Vehicles were worth less as the result of Defendant's concealment of, and failure to remedy, the Defect. This diminished value is directly attributed to Defendant's dishonesty and omissions with respect to the quality and safety of the Vehicles.

204. Defendant's concealment of the defects in Plaintiff Brown's Vehicles was material to Plaintiff Brown.

205. Defendant violated the Missouri MPA by concealing and failing to disclose the Defect. Defendant had an ongoing duty to Plaintiff Brown and the Missouri Class to refrain from unfair and deceptive practices under the Missouri MPA in the course of its business.

206. As a direct and proximate result of Defendant's violations of the Missouri MPA, Plaintiff Brown has suffered injury-in-fact and/or actual damage as alleged above. As a direct result of Defendant's misconduct, all Plaintiff Brown and Class members incurred damages in at least the form of lost time required to repair their vehicles.

207. Defendant is liable to Plaintiff Brown and Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

### TENTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability Pursuant to**
**Mo. Rev. Stat. § 400.2-314**
**(Plaintiff Brown on behalf of the Missouri Class)**

208. Plaintiff Brown incorporates by reference each and every allegation set forth above as if fully written herein.

209. Plaintiff Brown brings this claim on behalf of the Missouri Class.

210. Defendant was at all relevant times a "merchant" as defined by Mo. Rev. Stat. §

400.2-104 and a "seller" of motor vehicles under § 400.2-103(1)(d).

211.    The Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

212.    A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

213.    These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from the Shift to Park Defect that can make driving unreasonably dangerous and unreliable.

214.    Defendant was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class Members and from dealers and other repair facilities.

215.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Brown and the other Missouri Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## ELEVENTH CAUSE OF ACTION
### Breach of Express Warranty Pursuant to Pursuant to
### Mo. Rev. Stat. § 400.2-313
### (Plaintiff Brown on behalf of the Missouri Class)

216.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

217.    In connection with the sale or lease of the Class Vehicles, Defendant provided

49

Plaintiff Brown and the Missouri class members with a New Vehicle Limited Warranty, under which it agreed to provide repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period, excluding slight noise, vibrations, or other normal characteristics of the vehicle, within the first 36 months or 36,000 miles in service, whichever comes first.

218.    Plaintiff Brown and the Missouri Class members relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

219.    Plaintiff Brown and the Missouri Class members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the Shift to Park Defect under the vehicle's warranty as described herein.

220.    Plaintiff Brown and the Missouri Class members have given Defendant a reasonable opportunity to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

221.    As a result of said nonconformities, Plaintiff Brown and the Missouri Class members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

222.    Plaintiff Brown and the Missouri Class members could not reasonably have discovered said nonconformities with the Class Vehicles prior to their acceptance of the Class Vehicles.

223.    Plaintiff Brown and the Missouri Class members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Shift to Park

Defect.

224.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiff Brown and the Missouri Class members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

**TWELFTH CAUSE OF ACTION**
**Violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601,** *et seq.*
**(Plaintiff Malmkar on behalf of the Nebraska Class)**

225.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully written herein.

226.    This claim is brought by Plaintiff Malmkar on behalf of the Nebraska Class.

227.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

228.    Defendant, Plaintiff, and Nebraska Class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

229.    GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

230.    By concealing and failing to disclose the Shift to Park Defect, GM violated the Nebraska CPA.  GM had an ongoing duty to Plaintiff and the other Nebraska Class members to refrain from unfair and deceptive practices under the Nebraska CPA in the course of its business.

231.    Plaintiff and the other Nebraska Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealments, misrepresentations, and/or failure to disclose material information concerning the Defect.

232.    Because GM's conduct caused injury to Plaintiff's property through violations of the Nebraska CPA, Plaintiff seeks recovery of actual damages as well as enhanced damages up to $1,000, an order enjoining GM's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

### THIRTEENTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability Pursuant to Neb. Rev. Stat. § UCC § 2-314**
**(Plaintiff Malmkar on behalf of the Nebraska Class)**

233.    Plaintiffs incorporate by reference each and every allegation set forth above as if fully written herein.

234.    Plaintiff Malmkar brings this claim on behalf of the Nebraska Class.

235.    GM was at all relevant times a merchant with respect to motor vehicles.

236.    At the time that GM sold and distributed the Vehicles to Plaintiff Malmkar and the Nebraska Class, the Vehicles were not merchantable because, among other reasons, they were dangerous, unsafe, unreliable, and not fit for their ordinary purpose of functioning and operating due to the Shift to Park Defect.

237.    These Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Vehicles are defective in that the Defect renders them unsafe, inconvenient, unreliable and imperfect such that Plaintiff and the other Nebraska Class members would not have purchased the Vehicles had they known of the Defect.

238.    GM knew about the Defect at the time of purchase, allowing it to cure its breach of warranty if it chose.

239.    GM was provided notice of these issues by numerous complaints against it,

including the instant Complaint, and by, inter alia, customer complaints, letters, emails and other communications from Class members and from dealers and other repair facilities.

240. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Nebraska Class members have been damaged in an amount to be proven at trial, including, but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

**FOURTEENTH CAUSE OF ACTION**
**Violation of the Massachusetts Consumer Protection Act, M.G.L. 93A § 2, *et seq.***
**(Plaintiff Crosier on behalf of the Massachusetts Class)**

241. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

242. The Massachusetts Consumer Protection Act ("MCPA") prohibits and declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

243. Defendant violated the MCPA when it sold or leased Plaintiff Crosier and Class Members the Class Vehicles with knowledge that the vehicles suffered from the Shift to Park Defect, but Defendant knowingly concealed and failed to disclose said defects to Plaintiff Crosier and Class Members with the intent that Plaintiff Crosier and Class Members rely upon its concealment.

244. Defendant additionally violated M.G.L. 93A § 2 by breaching the implied warranty of merchantability by selling the defective vehicles.

245. The Class Vehicles' Shift to Park Defect poses an unreasonable safety risk to consumers and other members of the public with whom they share the road and prevents the vehicles from providing reliable and safe transportation.

246. In the course of Defendant's business, Defendant willfully failed to disclose and

actively concealed that the Class Vehicles are defective. The existence of the Shift to Park Defect, which manifests in all or substantially all of the Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, impairs the vehicles' ability to provide safe and reliable transportation, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

247.    In purchasing or leasing the Class Vehicles, Plaintiff Crosier and Class Members were deceived by Defendant's failure to disclose at the time of sale or lease that the Class Vehicles suffered from the Shift to Park Defect as described above.

248.    Defendant owed Plaintiff Crosier and Class Members a duty to disclose the truth about the Shift to Park Defect at the time of sale or lease because:

    a.    Defendant was in a superior position to know the true state of facts about the Class Vehicles' Shift to Park Defect

    b.    Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use;

    c.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and the Shift to Park Defect; and

    d.    Defendant actively concealed the defective nature of the Class Vehicles and their Shift to Park Defect from Plaintiff Crosier and Class Members.

249.    Defendant intentionally and knowingly concealed material facts regarding the Class Vehicles with an intent to mislead Plaintiff Crosier and Class- Members.

250.    Plaintiff Crosier and Class Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false

and gravely misleading.

251.     Plaintiff Crosier and Class Members were unaware of the Shift to Park Defect when they purchased their vehicles and would not have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, of such defects in the Class Vehicles.

252.     As a result of Defendant's acts, Plaintiff Crosier and Class Members have suffered damages in that they are left with vehicles of diminished value and utility because of the Shift to Park Defect.

253.     Defendant's failure to disclose the Shift to Park Defect to Plaintiff Crosier and Class Members and its breach of warranties constitute an unfair or deceptive act in violation of MGL. c. 93A § 2.

254.     Defendant willfully or knowingly violated Chapter 93A and as such, Plaintiff Crosier is entitled to double or treble damages plus reasonable attorney's fees and costs.

255.     Upon information and belief, GM does not maintain a place of business within the Commonwealth of Massachusetts, nor does it keep any assets in the Commonwealth of Massachusetts. See M.G.L. c. 93A, § 9(3) (pre-suit notice requirements do not apply "if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth").

256.     Pursuant to M.G.L. c. 93A, § 9, Plaintiff Crosier is entitled to and does seek appropriate injunctive relief, recovery of actual damages, treble damages, and her reasonable costs and attorneys' fees.

## FIFTEENTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to M.G.L. 106 § 2A-314**
**(Plaintiff Crosier on behalf of the Massachusetts Class)**

257. Plaintiff Crosier incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

258. Defendant is a merchant with respect to motor vehicles.

259. Plaintiff Crosier's Vehicle and Class Vehicles were each subject to implied warranties of merchantability, as defined in M.G.L. 106 § 2A-314, running from the Defendant to the Plaintiff Crosier and putative class members.

260. An implied warranty that the Crosier Vehicle and Class Vehicles were merchantable arose by operation of law as part of the purchase of the subject vehicles.

261. Defendant breached the implied warranty of merchantability because as a result of the Shift to Park Defect, the Crosier and Class Vehicles and were not in merchantable condition when the Plaintiff Crosier and putative class members purchased them, or at any time thereafter, and the subject vehicles are unfit for the ordinary purposes for which such vehicles are used.

262. Plaintiff Crosier and Class Members used their Class Vehicles for the ordinary purpose that consumer automobiles are used — to transport passengers and belongings reliably, comfortably, and safely for personal, family, or-household purposes.

263. Despite Plaintiff Crosier's and Class Members' ordinary and-expected use of their vehicles, the Class Vehicles did not adhere to minimal consumer expectations, were not of fair and average quality, and would not pass without objection in the consumer automotive industry at the time of sale.

264. Plaintiff Crosier notified Defendant and one of its authorized dealerships of the defects in the Crosier Vehicle within a reasonable time after Plaintiff Crosier discovered them.

265.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Crosier and Class Members have suffered damages in an amount to be determined at trial.

266.    Plaintiff Crosier, individually, and on behalf of the Class, seeks all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing and rental charges incurred as a result of the Class Vehicles' defect; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant as follows:

a.   An order certifying the proposed Classes, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

b.   An order awarding Plaintiffs and class members their actual damages, incidental and consequential damages, punitive damages, and/or other form of monetary relief provided by law;

c.   An order awarding Plaintiffs and the classes restitution, disgorgement, or other equitable relief as the Court deems proper;

d.   Equitable relief including, but not limited to, replacement of the Class Vehicles with new vehicles, or repair of the Class Vehicles' Shift to Park

Defect with an extension of the express warranties and service contracts which are or were applicable to the Class Vehicles;

e. A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

f. Reasonable attorneys' fees and costs;

g. Pre-judgment and post-judgment interest, as provided by law;

h. Plaintiffs demand that Defendant perform a recall, and repair all Class Vehicles; and

i. Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: April 9, 2024

Respectfully submitted,

By:  */s/ Sergei Lemberg*
Sergei Lemberg
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile: (203) 653-3424
slemberg@lemberglaw.com

*Counsel for Plaintiff*